ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**[1]

| | | |
|---|---|---|
| **CASCADE FUNDING MORTGAGE TRUST HB8 IF TRUSTEE NAME IS NEEDED-WILMINGTON SAVINGS FUND SOCIETY, FSB, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE FOR CASCADE FUNDING MORTGAGE TRUST HB8** <br> DEMANDANTE(S)-APELADA(S) <br><br> V. <br><br> **SUCESIÓN DE CARMEN QUIÑONES MÁRQUEZ COMPUESTA POR CARILYN FEBRES QUIÑONES, Y OTROS** <br> DEMANDADA(S)-APELANTE(S) | **TA2025AP00132** | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de **CAROLINA** <br><br><br> Caso Núm.: **CN2018CV00069 (401)** <br><br><br> Sobre: Cobro de Dinero (Ordinario) y Otros |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y el Juez Sánchez Báez.

*Barresi Ramos*, juez ponente

## S E N T E N C I A

En San Juan, Puerto Rico, hoy día 12 de enero de 2026.

Comparece ante este Tribunal de Apelaciones, la señora **CARILYN FEBRES QUIÑONES** (señora **FEBRES QUIÑONES**) mediante *Apelación* incoada el 15 de julio de 2025. En su recurso, nos solicita que revisemos la *Sentencia* concretada el 19 de febrero de 2025 por el Tribunal de Primera Instancia (TPI), Sala Superior de Carolina.[2] En dicha decisión judicial, el foro apelado declaró ha lugar la *Demanda* interpuesta el 10 de abril de 2018 por **LIVE WELL**

---

[1] Véase *Orden Administrativa DJ 2024-062C de 6 de mayo de 2025 sobre Designación de Paneles en el Tribunal de Apelaciones*.

[2] Este dictamen judicial fue notificado y archivado en autos el 26 de febrero de 2025. Apéndice de la *Apelación*, entradas núm. 140 y 141 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

FINANCIAL, INC. ahora CASCADE FUNDING MORTGAGE TRUST HB8 IF TRUSTEE NAME IS NEEDED-WILMINGTON SAVINGS FUND SOCIETY, FSB, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE FOR CASCADE FUNDING MORTGAGE TRUST HB8 (CASCADE) sobre cobro de dinero y ejecución de hipoteca por la vía ordinaria; condenó a la SUCESIÓN DE CARMEN QUIÑONES MÁRQUEZ a pagar la cantidad de $301,116.10 que incluye intereses y otros gastos acumulados hasta el 31 de diciembre de 2023, los cuales continúan acumulándose a razón de 7.00% hasta su total y completo pago; más $23,700.00 para gastos, costos y honorarios de abogado; y apercibió que de no satisfacer las cuantías adeudadas, se ordenará la ejecución y venta en pública subasta del inmueble hipotecado.

Asimismo, nos solicita que revisemos la *Resolución Interlocutoria* prescrita el 11 de junio de 2025 en la cual se declaró no ha lugar la *Moción de Reconsideración (Entrada Número 140) Relevo de Sentencia;* y la *Moción de Desestimación.*[3]

Exponemos el trasfondo fáctico y procesal que acompañan a la presente controversia.

- I -

El 10 de abril de 2018, LIVE WELL FINANCIAL, INC. (LIVE WELL) entabló *Demanda* sobre cobro de dinero y ejecución de hipoteca por la vía ordinaria contra la SUCESIÓN DE CARMEN QUIÑONES MÁRQUEZ, compuesta por la señora FEBRES QUIÑONES.[4] Adujo que el 30 de abril de 2010, la señora CARMEN QUIÑONES MÁRQUEZ (señora QUIÑONES MÁRQUEZ) obtuvo un préstamo hipotecario concedido por POPULAR MORTGAGE, INC. (POPULAR MORTGAGE) garantizado por una hipoteca revertida por la suma de $237,000.00, con

---

[3] Notificada y archivada en autos el 16 de junio de 2025. Apéndice de la *Apelación*, entrada núm. 152 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[4] Apéndice de la *Apelación*, entrada núm. 1 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA). Durante la tramitación de esta reclamación, la *Demanda* fue enmendada en dos (2) ocasiones: la primera para hacer constar en el epígrafe a FIRST HORIZON BANK como parte demandante; y la segunda enmienda para sustituir e incluir a CASCADE como parte demandante.

intereses al 7.00% anual ajustables mensualmente con fecha de vencimiento de 1 de octubre de 2085. La hipoteca revertida grava la propiedad descrita a continuación:

> ---URBANA: Solar radicado en el Barrio Canóvanas del término Municipal de Loíza, Puerto Rico, marcado con el número seiscientos ochenta y dos del Bloque "J" del Plano de Inscripción de la Urbanización "Loíza Valley", con una cabida superficial de trescientos treinta metros cuadrados con treinta y cuatro centímetros cuadrados, en lindes por el NORTE, en trece metros ochenta y tres centímetros, con el solar trescientos treinta y cuatro del Bloque "J"; por el SUR, en doce metros sesenta centímetros, con la Calle Cala número veinte; por el ESTE, en veinticinco metros, con el solar seiscientos ochenta y tres del Bloque "J"; y por el OESTE, en veinticinco metros, con el solar seiscientos ochenta y uno del Bloque "J".--

> ---**Finca número 965, inscrita al folio 175 del tomo 24 de Canóvanas, Registro de la Propiedad de Puerto Rico, Sección III de Carolina.**--------------------------------------------

Conforme a la hipoteca revertida, las partes convinieron, entre otros, los *Fundamentos para Acelerar la Deuda*. Así, en el párrafo Quinto, en su inciso 9(a)(i), pactaron que el acreedor hipotecario podrá requerir el pago total inmediato de todas las sumas garantizadas por dicha hipoteca si "*un Deudor muere y la propiedad no es la residencia principal de al menos un Deudor sobreviviente*".

Lastimosamente, la señora **QUIÑONES MÁRQUEZ** falleció lo cual provocó que el préstamo garantizado por la hipoteca revertida adviniera vencido y pagadero. Por eso, **LIVE WELL FINANCIAL** requirió el pago del pasivo del préstamo hipotecario que a la fecha de la *Demanda* ascendía a $155,779.70 por concepto de principal, más los intereses acumulados y que continuaban acumulándose.

El 24 de mayo de 2018, la señora **FEBRES QUIÑONES**, por derecho propio, presentó su *Contestación a la Demanda*.[5] Expresó que era su deseo retener la propiedad, corresponder al acreedor y al momento vivía en la residencia.

---

[5] Apéndice de la *Apelación*, entrada núm. 18 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

Trabada así la polémica, el 31 de mayo de 2018, a tenor con la Ley Núm. 184-2012, según enmendada, se decretó *Orden de Referido al Centro de Mediación de Conflictos en Casos de Ejecución de Hipotecas*.[6] El 20 de junio de 2018, el Centro de Mediación de Conflictos (CMC) presentó *Moción Informativa* notificando que las partes asistieron a la cita y el acreedor hipotecario no había brindado a la señora **FEBRES QUIÑONES** la orientación requerida por la Ley Núm. 184-2012, según enmendada. Concluyó que, en ese momento, considerando las condiciones del caso, el mismo no era adecuado para mediación.

Posteriormente, el 15 de octubre de 2019, se dictaminó *Orden Enmendada de Referido al Centro de Mediación de Conflictos en Casos de Ejecución de Hipotecas* pautando reunión para el 24 de enero de 2020.[7] Las partes iniciaron un proceso de negociación auscultando la alternativa de venta corta o "*short sale*".[8] Para ello, CMC celebró múltiples reuniones y pidió varias extensiones.

A la postre, el 7 de marzo de 2023, el CMC presentó *Moción Informativa sobre Resultado de Caso de Ejecución de Hipoteca Atendida Mediante Servicios de Videoconferencia*.[9] En esta, reveló que el 27 de febrero de 2023, las partes alcanzaron un acuerdo recogido en la *Aceptación de Acuerdos por Videoconferencia*.[10] Concertaron que: (i) la señora **FEBRES QUIÑONES** se acogía a la alternativa de compraventa al descubierto de la propiedad en litigio por la suma de $76,950.00; y (ii) la señora **FEBRES QUIÑONES** se comprometía a ser diligente con el procedimiento para completar la compraventa en sesenta (60) días a partir de la firma de dicho

---

[6] Apéndice de la *Apelación*, entrada núm. 23 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[7] *Íd.*, entrada núm. 51 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[8] *Íd.*, entradas núm. 78, 82, 84, 86, 88, 96 y 98 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[9] Apéndice de la *Apelación*, entrada núm. 100 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[10] *Íd.*, anejo entrada núm. 100 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

acuerdo. De otro lado, **CASCADE** concordó a desestimar la interpelación sobre ejecución de hipoteca una vez se cumpliera con el procedimiento de compraventa.

El 21 de marzo de 2023, las partes presentaron *Moción Conjunta en Cumplimiento de Orden*.[11] Habida cuenta del convenio entre las partes clamaron la paralización del caso hasta el 28 de abril de 2023 (fecha en la cual vencen los sesenta días).

El 19 de octubre de 2023, **CASCADE** presentó una *Moción en Cumplimiento de Orden e Informativa*.[12] Manifestó que, durante los pasados meses, las partes continuaron en conversaciones para lograr la compraventa del bien inmueble en litigio. En ánimo de proporcionar a la señora **FEBRES QUIÑONES** amplia oportunidad para completar su proceso de financiamiento, **CASCADE** extendió en varias ocasiones la aprobación de la oferta de venta corta (short sale) a favor de la señora **FEBRES QUIÑONES**. No obstante, la señora **FEBRES QUIÑONES** no logró completar la transacción. Ante ello, **CASCADE** imploró la continuación de los procedimientos sobre ejecución de hipoteca.

El 30 de octubre de 2023, la señora **FEBRES QUIÑONES** presentó una *Moción en Cumplimiento de Orden*.[13] En apretada síntesis, aseveró que se encontraba en comunicación con la institución bancaria acreedora para los trámites de mitigación de pérdida; recientemente había recibido el paquete de información; y remitió los documentos exigidos. En vista de ello, recabó la paralización del caso hasta tanto se atendiera su petitoria de mitigación de pérdidas.

Luego de varios trámites legales, el 17 de diciembre de 2024, **CASCADE** presentó una *Solicitud de Continuación de los Procedimientos* exteriorizando

---

[11] Apéndice de la *Apelación*, anejo entrada núm. 103 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[12] *Íd.*, entrada núm. 110 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[13] Apéndice de la *Apelación*, entrada núm. 112 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

que no existía un pedido de mitigación de pérdidas activo y/o pendiente así pues procuró la continuación de los procedimientos. [14] En estas circunstancias, el 14 de febrero de 2025, mediante *Orden* se dispuso la continuación de los procedimientos.[15]

El 19 de febrero de 2025, CASCADE presentó su *Solicitud de Sentencia*.[16] Acreditó que no existían controversias reales o sustanciales sobre hechos materiales y medulares en el caso por lo que, no existía impedimento para que la causa de acción fuese atendida y resuelta por la vía sumaria. En esa misma fecha, el foro apelado concretó *Sentencia* apelada.

En desacuerdo, el 8 de marzo de 2025, la señora FEBRES QUIÑONES presentó una *Moción de Reconsideración (Entrada Número 140) Relevo de Sentencia*.[17] Sustentó que las partes se hallaban en una etapa avanzada de negociaciones para que la señora FEBRES QUIÑONES pudiera conservar su hogar; en la alternativa, se debía dejar sin efecto la *Sentencia* y paralizar el caso mientras culminaban las gestiones.

Más adelante, el 14 de marzo de 2025, la señora FEBRES QUIÑONES presentó una *Moción de Paralización* arguyendo que cursó una petición de mitigación de pérdidas a CASCADE.[18] El 19 de marzo de 2025, se expidió *Orden* declarando ha lugar la *Moción de Paralización*.[19]

El 2 de abril de 2025, CASCADE presentó su *Moción Informativa*.[20] Expuso que había revisado los documentos suministrados por la señora FEBRES QUIÑONES; el 1 de abril de 2025, se le había enviado misiva para que

---

[14] *Íd.*, entrada núm. 131 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[15] Apéndice de la *Apelación*, entrada núm. 138 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[16] *Íd.*, entrada núm. 139 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[17] *Íd.*, entrada núm. 142 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[18] Apéndice de la *Apelación*, entrada núm. 144 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[19] *Íd.*, entrada núm. 145 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[20] *Íd.*, entrada núm. 146 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

proveyera documentos adicionales y se apercibió que, de no facilitarlos, sería denegado el remedio.

Al tiempo, el 21 de abril de 2025, la señora FEBRES QUIÑONES presentó una *Moción de Desestimación*.[21] En esencia, enunció que CASCADE ha procedido de mala fe al no haberle provisto todas las alternativas de mitigación de pérdidas; y por ello, procedía el relevo de la *Sentencia*. El 12 de mayo de 2025, CASCADE presentó *Réplica y Oposición a Moción de Reconsideración (Entrada Número 140) Relevo de Sentencia; Solicitud de Inspección de Pagaré Original y Oposición a Moción de Desestimación*.[22] Aseguró que le convidó numerosas oportunidades para que se acogiera a alguna de las alternativas de mitigación de pérdida disponibles para evitar la ejecución de la propiedad en litigio.

El 11 de junio de 2025, se intimó una *Resolución Interlocutoria* en la cual se declaró no ha lugar la *Moción de Reconsideración (Entrada Número 140) Relevo de Sentencia;* y la *Moción de Desestimación*.[23] Precisó que CASCADE y la señora FEBRES QUIÑONES habían logrado unos pactos ante el CMC; se había paralizado el caso ante una petición de quiebras que se dejó sin efecto cuando el Tribunal de Quiebras levantó la paralización; CASCADE le ofreció todas las alternativas de mitigación de pérdidas a la señora FEBRES QUIÑONES; y la señora FEBRES QUIÑONES infringió al no presentar todos los documentos ante el Departamento de Mitigación de la institución bancaria. Además, esclareció que contrario a las alegaciones de la señora FEBRES QUIÑONES, la propiedad no constituye su residencia principal toda vez que se encuentra arrendada.[24]

---

[21] *Íd.*, entrada núm. 148 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[22] Apéndice de la *Apelación*, entrada núm. 150 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[23] *Íd.*, entrada núm. 152 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[24] Apéndice del *Alegato de la Parte Demandante-Apelada*, Anejo 2, págs. 2-6.

El 20 de junio de 2025, CASCADE presentó su *Moción en Solicitud de Ejecución de Sentencia*.[25] Por esto, el 23 de junio de 2025, se determinaron la *Orden de Ejecución de Sentencia Mediante Venta Judicial* y el *Mandamiento*.[26]

Inconforme, el 12 de julio de 2025, la señora FEBRES QUIÑONES presentó una *Moción de Reconsideración* para que se dejara sin efecto la *Orden de Ejecución de Sentencia Mediante Venta Judicial* y el *Mandamiento* por nulidad, y releve a la señora FEBRES QUIÑONES de dichos dictámenes.[27]

Aun insatisfecha con el proceder judicial, el 15 de julio de 2025, la señora FEBRES QUIÑONES recurrió ante este foro intermedio revisor mediante *Apelación* en la cual señaló el(los) siguiente(s) error(es):

> Erró y abusó de su discreción el foro de instancia al dictar Sentencia en este caso, cuando surge del expediente del último que la[s] partes de este caso se hallaban en etapas avanzadas de negociación, que la parte apelada no ha provisto a la parte apelante todas las alternativas de mitigación de pérdidas en contravención de la ley y que no hay prueba fehaciente sobre la tenencia con buena fe por la parte apelada del crédito del caso de epígrafe.

> Erró y abusó de su discreción el foro de instancia al no avalar la Moción de Desestimación y Reconsideración de la parte apelante, pese a que este caso reúne hechos y circunstancias suficientes que permiten su desestimación o que se declare nula su Sentencia y que se releve a la parte apelante de la última de conformidad con la Regla 49.2 de las de Procedimiento Civil, *supra*.

El 22 de julio de 2025, pronunciamos *Resolución* concediendo un lapso perentorio de treinta (30) días para exponer su posición sobre el recurso a CASCADE. En cumplimiento, el 22 de agosto de 2025, CASCADE presentó su *Alegato de la Parte Demandante-Apelada*. Especificó que la señora FEBRES QUIÑONES no presentó ningún argumento ni fundamento que justificara la revocación de la *Sentencia*.

Evaluado concienzudamente el expediente del caso y contando con el beneficio de la comparecencia de ambas partes, nos encontramos en posición

---

[25] Apéndice de la *Apelación*, entrada núm. 153 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[26] E *Íd.*, entradas núm. 154 y 155 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

[27] Apéndice de la *Apelación*, entrada núm. 157 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC-TA).

de adjudicar. Puntualizamos las normas de derecho pertinentes a las(s) controversia(s) planteada(s).

- II -

- A – *REAL ESTATE SETTLEMENT PROCEDURES ACT*

Con el objetivo de implementar el "*Real Estate Settlement Procedures Act*" (RESPA), el *Consumer Financial Protection Bureau* (CFPB), agencia federal encargada de uniformar todo lo concerniente a la protección de los consumidores en el sector financiero, promulgó la *Reglamentación X* (*Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act*).[28] El 10 de enero de 2014, se enmendó la *Reglamentación X* para incluir algunas normas referentes al proceso de mitigación de pérdidas de deudores hipotecarios. Particularmente, la enmienda sistematiza minuciosamente la presentación y evaluación de las solicitudes de mitigación de pérdidas. En específico, introdujo la reglamentación sobre el proceso interno del banco o acreedor hipotecario de mitigación de pérdida del hogar. [29] La reglamentación enmendada dispone que el banco o el acreedor hipotecario no podrá solicitar al Tribunal que ejecute la propiedad para satisfacer la deuda, hasta tanto no cumpla con los postulados del Reglamento.

Para cumplir con la *Reglamentación X,* un banco debe implementar un procedimiento de mitigación de pérdida de deuda, que le permita actuar con diligencia razonable, al comunicarse con el deudor para recopilar la información necesaria con el objetivo de completar la solicitud de mitigación en tiempo razonable.[30] Este programa debe incluir políticas y procedimientos que estén razonablemente diseñados, y deben permitir al deudor tener asignado personal al que pueda acudir para orientación e información.[31]

---

[28] Véase, RESPA en 12 USC § 2601. Véase, CFPB en 12 USC § 5491; 12 USC § 5514; 12 USC § 5515. Véase, Reglamentación X en 76 FR 78978; 78 FR 10696; 78 FR 44686; y 78 FR 39902.
[29] 12 CFR 1024.38-1024.41.
[30] 12 CFR 2410.38.
[31] 12 CFR 1024.38(a).

Para que un banco o acreedor hipotecario pueda evaluar una solicitud de mitigación de pérdidas, esta deberá estar completa.[32] La reglamentación preceptúa que cuando un deudor presenta una solicitud de mitigación de pérdidas el acreedor hipotecario deberá notificarle al deudor, dentro de un período de cinco (5) días, que recibió dicha solicitud y si la misma está completa o incompleta.[33] La regla advierte que en aquellos casos en los que se le notifique una falta de documentos necesarios para evaluar la solicitud, si el deudor somete todos los documentos solicitados, la petitoria se considerará "*facially complete*".[34] Si el acreedor hipotecario infiere que necesita información adicional o corregir documentos previamente sometidos para completar la solicitud, el acreedor debe requerirle al deudor la información faltante o los documentos con las correcciones pertinentes.[35] El banco debe, además, tratar la solicitud como si estuviese completada hasta tanto el deudor se le haya brindado una oportunidad razonable para completar la solicitud.[36] En aquellos casos donde el *acreedor hipotecario deniegue una solicitud de modificación del préstamo, la denegatoria debe contener las razones específicas que motivaron el rechazo* y permitirle al deudor apelar la determinación ante los ejecutivos del banco.[37]

Es importante resaltar que el acreedor hipotecario no está obligado a proveer una opción de mitigación específica.[38] Empero, de denegar la solicitud, el banco deberá notificar al deudor por escrito las razones específicas por las cuales denegó.[39] Por otro lado, la *Reglamentación X* permite ofrecer una opción de mitigación de pérdida -*sin que la solicitud esté completa*- cuando el ofrecimiento no está basado en evaluación alguna de la

---

[32] 12 CFR 1024.41(b)(1). La *Reglamentación X* define a la *solicitud completa* como: "[...]an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application".

[33] 12 CFR 1024.41(b)(2)(i)(B).

[34] 12 CFR 1024.41(c)(2)(iv).

[35] *Íd.*

[36] *Íd.*

[37] 12 CFR 1024.41(d); 12 CFR 1024.41(e). Énfasis suplido.

[38] 12 CFR 1024.41(a).

[39] 12 CFR 1024.41(d).

información sometida en relación con la solicitud.[40] De igual forma, exige a la institución financiera brindar una oportunidad razonable para completar la solicitud.[41] De manera que, es requisito notificar al deudor sobre cuál es la información adicional o documento corregido que se requiere, además de brindarle suficiente tiempo para recopilar la información o la documentación necesaria para completar la solicitud.[42] La cantidad de tiempo que se estima razonable dependerá de los hechos y las circunstancias de cada caso.[43] A estos efectos, el *Reglamento X* expresa:

> That the servicer may need additional information at a later date to evaluate the application, in which case the servicer will request that information from the borrower and give the borrower a reasonable opportunity to submit it, the evaluation process may take longer, and the foreclosure protections could end if the servicer does not receive the information as requested.[44]

## - B – *MEDIACIÓN COMPULSORIA*

A fin de proteger la residencia principal de los deudores hipotecarios y proveerles un mecanismo para evitar y reducir su ejecución, la Asamblea Legislativa aprobó la *Ley para Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipotecas de una Vivienda Principal,* Ley Núm. 184-2012.[45] Dicho estatuto *"tiene el propósito de proteger la* **residencia principal** *de los deudores hipotecarios ante los efectos de la crisis económica".*[46] En particular, provee para la celebración de una vista de mediación donde el deudor podrá recibir información relativa a *"los remedios que tiene disponibles para evitar la pérdida de su residencia principal y, a su vez, le provee la oportunidad de sentarse a negociar con su acreedor".*[47]

Nuestro Tribunal Supremo, reconociendo la obligatoriedad del proceso de mediación compulsoria previo a la ejecución de la propiedad

---

[40] 12 CFR 1024.41(c)(2)(i).
[41] 12 CFR 1024.41(c)(2)(iv).
[42] *Íd.*
[43] *Íd.*
[44] 12 CFR 1024.41(c)(3)(e).
[45] Ley Núm. 184 de 17 de agosto de 2012, según enmendada, conocida como *Ley para Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipotecas de una Vivienda Principal,* 32 LPRA § 2881 *et seq.*
[46] *Bco. Santander v. Correa García,* 196 DPR 452, 461 (2016). Énfasis nuestro.
[47] *Íd.;* Véase, además, *Exposición de Motivos* y Artículo 2(b) de la Ley 184-2012, 32 LPRA § 2881(b).

principal de un deudor hipotecario solventó:

> [d]espués de presentada la contestación a la demanda– el acto de citar para una vista de mediación es un requisito jurisdiccional que el tribunal debe cumplir en los casos en los que un acreedor solicite la ejecución de la vivienda principal de un deudor, **salvo en aquellos casos en que el deudor se encuentre en rebeldía o cuando el tribunal haya eliminado sus alegaciones. Estas son las únicas excepciones que estableció el legislador**. Por lo tanto, si el tribunal incumple con el requisito de ordenar la celebración de tal vista, no tendrá jurisdicción para proceder a dictar sentencia ni podrá ordenar la venta judicial del inmueble. En consecuencia, **las sentencias que el tribunal dicte y las ventas judiciales que ordene sin haber señalado una vista de mediación serán nulas y no tendrán efecto legal alguno**.[48]

Ahora bien, según lo dispuesto en el Art. 3 de la Ley Núm. 184-2012, la extensión de la mediación y su resultado dependerá del comportamiento de las partes.[49] Por eso, el tribunal podrá continuar con el proceso judicial cuando: **(1)** el acreedor acudió a la vista de mediación pero el deudor no se presentó; **(2)** las partes acudieron a la vista y se cumplieron los requisitos de ley, pero no llegaron a un acuerdo; o, **(3) el deudor incumplió con los acuerdos contraídos como resultado del proceso de mediación**.[50]

Sobre el requisito de *buena fe* en los procesos de mediación el Tribunal Supremo enfatizó:

> [d]e conformidad con el propósito de la Ley 184, el requisito de buena fe en la mediación en los procesos de ejecuciones de hipoteca de una vivienda principal debe ser definido en armonía con el requisito compulsorio y jurisdiccional. **En primer lugar**, las partes deben ir preparadas para negociar y llegar a un acuerdo, de ser posible. **En segundo lugar**, las partes deben llevar a la vista o al acto de mediación toda la documentación que requiere el proceso de mediación y cualquier otra documentación necesaria. **En tercer lugar**, el representante del acreedor hipotecario debe tener autoridad para llegar a un acuerdo. **Finalmente**, los acreedores deben proveer a los deudores todas las alternativas disponibles en el mercado, tales como la modificación del préstamo, un análisis en virtud de los programas federales *Home Affordable Modification Program* (HAMP) y *Home Affordable Refinance Program* (HARP), entre otras. [...].[51]

---

[48] *Bco. Santander v. Correa García, supra*, pág. 472. Véase, además, Art. 3 de la Ley Núm. 184-2012, 32 LPRA § 2882. (Énfasis suplido).

[49] *Bco. Santander v. Correa García, supra*, pág. 473; 32 LPRA § 2882.

[50] *Bco. Santander v. Correa García, supra*, págs. 473-474.; 32 LPRA § 2882. Énfasis nuestro.

[51] *Scotiabank v. SLG Rosario-Castro*, 205 DPR 537, 557–558 (2020).

## - III -

La señora **FEBRES QUIÑONES** puntea que el tribunal de instancia incidió al dictar *Sentencia* dado que las partes se encontraban en etapas avanzadas de negociación; **CASCADE** no le proveyó todas las alternativas de mitigación de pérdidas; y no existe prueba fehaciente sobre la tenencia de *buena fe* del crédito. Amplia la señora **FEBRES QUIÑONES** que el foro primario erró al no avalar su *Moción de Desestimación* y *Reconsideración* pese a que el caso reúne hechos y circunstancias suficientes que permiten su desestimación o, se declare nula la *Sentencia* y se le releve.

**CASCADE** replica que la señora **FEBRES QUIÑONES** no presentó argumento o fundamento que justifique la revocación de la *Sentencia,* cumplió con todos los postulados que imperan en el ordenamiento jurídico sobre ejecución de hipoteca y no procede el relevo del dictamen.

Se desprende del expediente judicial, que la señora **FEBRES QUIÑONES** y **CASCADE** acataron el referido al proceso de mediación que se extendió por varios meses. Consecuentemente, las partes convinieron una *Aceptación de Acuerdos por Videoconferencia* en la cual la señora **FEBRES QUIÑONES** se acogió a la alternativa de venta corta (short sale) y concilió ser diligente en el procedimiento para completar la compraventa dentro de sesenta (60) días. Ello a partir del 27 de febrero de 2023, fecha de la firma de dicha *Aceptación de Acuerdos por Videoconferencia.*

Más, desde el 27 de febrero de 2023 hasta el 19 de febrero de 2025, fecha en que **CASCADE** presentó su *Solicitud de Sentencia*, la señora **FEBRES QUIÑONES** incumplió con la *Aceptación de Acuerdos por Videoconferencia.* Durante ese periodo de tiempo, la señora **FEBRES QUIÑONES** no cumplimento el proceso de venta corta pese a las múltiples oportunidades que le brindo **CASCADE** y el propio Tribunal. Nótese que las oportunidades que se le brindaron a la señora **FEBRES QUIÑONES** excedieron por mucho los sesenta (60) días contemplados en la *Aceptación de Acuerdos por Videoconferencia.*

A raíz del propio incumplimiento de la señora FEBRES QUIÑONES para con los acuerdos contraídos como resultado del proceso de mediación, obligó a CASCADE requerir la continuación del proceso judicial para culminar el trámite. Tras justipreciar suspicazmente la totalidad del expediente judicial, hacemos constar que, no se incidió en los errores señalados.

- IV -

Por los fundamentos antes expuestos, **confirmamos** la *Sentencia* decidida el 15 de julio de 2025 por el Tribunal de Primera Instancia, Sala Superior de Carolina; y la *Resolución Interlocutoria* decretada el 11 de julio de 2025 por el Tribunal de Primera Instancia, Sala Superior de Carolina.

**Notifíquese inmediatamente**.

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones
